IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BARBARA L. SPENCER, ) | |
| ) | |
| Plaintiff, ) | Case No. 07-C-4641 |
| ) | |
| vs. ) | Judge Arlander Keys |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Barbara L. Spencer, moves this court for Summary
Judgment, pursuant to Rule 56(a) of the Federal Rules of Civil
Procedure, to reverse or remand the final decision of the
Commissioner of Social Security (the "Commissioner"), who denied
her claim for Disability Insurance Benefits ("DIB"). 42 U.S. C.
§ 401 et seq. (West 2007). For the reasons set forth below, the
Court grants Plaintiff's Motion, in part, remanding the matter
back to the Commissioner for proceedings consistent with this
decision.

### Procedural History

Barbara Spencer ("Plaintiff") filed for Disability Insurance
Benefits under Title II of the Social Security Act, 42 U.S.C. §§
416(I) and 423 on February 7, 2007. R at 25. Plaintiff claimed
disability since June 15, 1995. R at 97. Plaintiff's
application was originally denied on June 6, 2005, and it was

subsequently denied on August 19, 2005 after reconsideration. R at 25, 27.

On September 12, 2005, Plaintiff sought appeal of the denials and filed a timely Request for Hearing before an Administrative Law Judge ("ALJ"). R at 41. Plaintiff's request was granted, and Plaintiff appeared before ALJ Alan Jonas on March 22, 2006. R at 512-60. At that time, she appeared with counsel and testified; her husband and a Vocational Expert ("VE"), James Radke, also provided testimony. R at 512-60. On January 24, 2007, the ALJ denied Plaintiff's application, finding that she was not disabled prior to December 31, 1996, the date on which she was last insured for benefits. R at 17-24. Plaintiff then filed a Request for Review of this decision on February 19, 2007, and that request was denied by the Appeals Council on June 19, 2007, rendering the ALJ's denial the final decision of the Commissioner of Social Security (the "Commissioner" ). R at 5-7, 13. Plaintiff then filed a complaint with this Court on August 16, 2007, asking this Court to remand or reverse the Defendant's decision. The Commissioner has filed a response to Plaintiff's Motion, arguing that the decision should be affirmed.

## Factual History

### Plaintiff's Testimony

Plaintiff was diagnosed with non-Hodgkin's lymphoma in the mid-1980s, and has endured a number of recurrences. Plaintiff

2

testified that she was last employed full-time in 1995, as a sales manager for a construction company. R at 519. At that point, she stopped working as the result of a knee injury. R at 519. Since then, she only worked for a brief period in 1999, but had to stop because of knee, heart, and sinus problems that caused her to be lightheaded, fatigued, and unable to perform the task of lifting. R at 514-19.

Plaintiff testified that she commenced chemotherapy in 1995. R at 525. She stated that, following her treatment, she suffered from an irregular heartbeat, sinus problems, back pain, extreme weakness, and the loss of toe nails. R at 525, 532-33, 546-47. Plaintiff also claimed that, by 1997, she was frequently suffering night sweats as a result of her non-Hodgkin's lymphoma. R at 533. She testified too that these night sweats were possibly present as far back as 1985 (before her diagnosis). R at 542.

Plaintiff testified that, prior to 1995, she had knee surgery, where a piece of coral was inserted into her knee joint, causing her knee to become very sensitive to any temperatures or tapping. R at 539-41. Plaintiff further stated that she had her shoulder rebuilt, and that the process required her to take massive amounts of Prednisone, thus reducing her muscle tone. R at 540. Plaintiff testified that she exercised after these surgeries in an effort to be able to support herself with

3

crutches. R at 525-26. She stated that, by February of 1997, the effects of her chemotherapy had dissipated to the point that she was strong enough for further leg surgery. R at 526. Plaintiff then testified that, although she felt better at this point, activity on one day would cause her to have to rest her legs on the next. R at 527. Plaintiff testified that these circumstances persisted until her next leg surgery in 1999. R at 527. Following that procedure, plaintiff went for several months of physical therapy. R at 530-31.

Plaintiff testified that she also suffered from chronic sinus problems and neck pain up until the hearing, which she believed were symptoms consistent with her lymphoma. R at 533-34. Plaintiff's cancer recurred in 2005, and at the time of the hearing she was undergoing platelet transfusions and chemotherapy ending in stem cell transplants. R at 537. Plaintiff testified that, since the recurrence of her lymphoma, she was constantly concerned with her lack of health and well-being and never enjoyed a period of time in which she felt well with energy. R at 538-39. Plaintiff also testified that her physician (Dr. Fisher) instructed her not to return to work on a construction site due to the possibility of infection[1]. R at 544. She stated that, considering the problems with her legs and back and her

---

[1] The Record is devoid of medical evidence supporting this statement.

4

compromised immune system, she did not know whether she could ever sit in an office for a full work week. R at 544-45.

**Peter Spencer's Testimony**

The Plaintiff's husband, Peter Spencer, testified that he married the Plaintiff in 1987 and that she had cancer as well as knee and shoulder surgeries after they were married. R at 548. He further testified that, after her cancer returned in 1995, Plaintiff only briefly tried to work. R at 549. Mr. Spencer testified that his wife's health improved after her second chemotherapy, but also that her general stamina was adversely affected. R at 550. He stated that she came to visit him once while he was working on a project in San Francisco in 1997 and once while on a project in New York in 2000. R at 550-51. He testified that they had problems with planning trips due to Plaintiff's illnesses, leading to several cancellations. R at 553.

He further testified that Plaintiff completed physical therapy before and after her surgery in 1999, but that she typically would only walk a block or two. R at 551-53. In general, however, he testified that her gait was fairly normal, but she sometimes walked with a limp. R at 552. He testified that after her second leg surgery in 1999, Plaintiff experienced some relief, but that she had an odd gait. R. at 553. A good day for the Plaintiff might involve going to lunch with her

parents, shopping, or doing something with their children, but Plaintiff would then have to spend the next day in bed recuperating. R at 554. He further stated that Plaintiff's reaction to exercising indicated that she would have been unable to perform the duties of her job. R at 554. Mr. Spencer also testified that Plaintiff suffered extreme night sweats, enduring sinus problems, and shoulder pain. Mr. Spencer indicated it was his impression that Plaintiff's knee injury and second chemotherapy created a domino effect, resulting in her other afflictions. R at 556-57. He also testified that he did not believe Plaintiff could fulfill the obligations of any full-time job, because of the exhaustion it would cause her. R at 556.

### Vocational Expert's Testimony

At the hearing, the vocational expert, James Radke, testified that, in general, missing more than one work day per month would jeopardize one's employment. R at 559.

### Plaintiff's Medical History

A.   *History Prior to the Last Date Plaintiff was Insured*

In 1989, Plaintiff was treated with chemotherapy at the Loyola University Medical Center in Chicago for a recurrence of her non-Hodgkins lymphoma. By January of 1991, her condition had stabilized and she was found to be "doing well." R at 388-97.

In February of that same year, Plaintiff complained of worsening pain and tenderness in her left shoulder, resulting in

6

decreased mobility. R at 386. On March 11, 1991, Doctor W. R. Dobozi, of Loyola University Medical Center, performed Weaver-Dunn reconstruction surgery of Plaintiff's left clavicle, due to the chronic left acromioclavicular instability of her left shoulder joint. R at 169. Dr. Dobozi noted that he had performed a clavicular resection on Plaintiff the year before, due to her traumatic arthritis. R at 169. Dr. Dobozi noted also that, at that time, he had informed Plaintiff that she would likely need Weaver-Dunn reconstruction surgery. R. at 169. Plaintiff's sutures were removed on March 21, 1991 and she began physical therapy on April 11, 1991. By May 7, 1991, she had regained full range of motion. R at 381-84.

Between 1992 and 1993, Plaintiff had regular check-ups, where she reported that she felt "great" and had "no complaints". R. at 374-80. In March, 1994, Plaintiff began reporting left knee pain with effusion and a patellar component. R at 373. On March 11, 1994, Dr. Dobozi performed left knee capsular release surgery on Plaintiff. due to arthritis with chondromalacia of the left knee, and she was discharged with a leg splint the following day. R at 172-78, 181-85. Specimens taken during the surgery revealed malignant lymphoma on the left side, mild chronic cholecystitis, and degenerative joint disease. R at 179-80. Plaintiff continued to have pain and swelling, and on July 25,

1994, Dr. Dobozi performed a Maquet osteotomy on her left patella. R. at 186.

After surgery, Plaintiff underwent physical therapy and was subsequently discharged "in good condition, without complaints of pain" on July 27, 1994. R. at 186. Plaintiff's casts were removed on September 13, 1994; she continued physical therapy through December, when she was noted to have full range of motion, but with some quad atrophy. R. at 351-56.

On March 7, 1995, Plaintiff saw Dr. Richard Fisher for a follow-up appointment. There was no evidence to suggest that Plaintiff's lymphoma had recurred, and the doctor noted that she had "no major complaints no B symptoms. Appetite is good. She is in her normal state of health." R at 349. On March 28, 1995, Plaintiff was found to have some left knee osteophytes, but she retained good range of motion in her ankle. R at 348. In June of 1995, Plaintiff was discovered to have a right neck mass but "no major complaints." R at 343, 346. An excisional biopsy of the neck mass was performed on June 27, 1995, and the procedure revealed a malignant, follicular lymphoma, predominantly nodular with mixed cellularity. R at 199-200. The biopsy was conducted by Dr. Fisher, who determined that Plaintiff had a "low-grade lymphoma recurrence that shows evidence of transforming to a large cell nodular lymphoma." R at 340. He further indicated that the condition would require chemotherapy. R at 340. At the

time of the biopsy, Plaintiff was noted to again be without "major complaints," although she did have night sweats in the preceding few weeks. R. at 340. Following the biopsy, on July 6, 1995, Plaintiff complained of some fatigue and an earache. R. at 338.

On July 11, 1995, Plaintiff began chemotherapy and was prescribed Prednisone. R. at 336. She also reported a year-long episode of blurry vision that spontaneously resolved itself. R. at 336. On August 1, 1995, three weeks after the first cycle of chemotherapy, it was reported that Plaintiff had suffered dizziness, nausea, finger-tingling, and headaches, all of which spontaneously resolved themselves. At that time, Plaintiff reportedly "felt well" overall. R. at 334. On August 22, 1995, however, Plaintiff reported nausea, vomiting, and numbness and tingling in her fingers as a result of the second cycle of chemotherapy. R. at 332-33.

By the fourth cycle, Plaintiff was doing well, although she had experienced some mouth sores, numbness and tingling in her fingers, and low blood counts. R. at 328-31. Cycle five of the Plaintiff's chemotherapy was not started until October 17, 1995, as she exhibited persistently low blood counts. R. at 324. Nevertheless, at this point, Plaintiff "essentially [had] no complaints," and was prescribed Darvon to manage the bone pain that she would suffer from the fifth cycle of chemotherapy. R at

324. Plaintiff's sixth and final cycle of chemotherapy commenced on November 7, 1995, at which time she was said to be "in very high spirits." R at 322. On November 15, 1995, Plaintiff's OB/GYN noted that her non-Hodgkins lymphoma was in remission and that she was menopausal. R at 207. Plaintiff was noted to be doing well though January 16, 1996, with "her energy and performance status [continuing] to improve after the end of chemotherapy." R at 318-21.

On February 27, 1996, Plaintiff reported having heart palpitations and a rash. R at 316-17. The palpitations continued less frequently through March of 1996. R at 314-15. On April 16, 1996, Plaintiff complained of a cold, but her heart palpitations had become rare occurrences at this point; overall she felt well and suffered "no major problems." R at 312-13. By May of 1996, Plaintiff "remained in complete remission," and reported an improvement in her levels of energy. R at 309-10. She remained well until August 13, 1996, when she was complaining of tiredness and stress surrounding the death of her mother-in-law. R at 304-308.

Plaintiff continued to feel quite well throughout the autumn of 1996. R at 302-303. On December 23, 1996, she again complained of heart palpitations that made it "problematic to [perform] her functions of everyday life." R at 300-301. However, she also reported being under significant stress because

10

of holiday obligations and the illnesses of her parents. R. at 300-301. One month later, she told Dr. D. Wallis, a cardiologist, that the most severe palpitation episode during this period had occurred while she was putting up a Christmas tree. R at 297-98.

B. *History Subsequent to the Last Date Plaintiff was Insured*

Dr. D. Wallis, the cardiologist, saw the Plaintiff on January 16, 1997, and she reported to him that she was "physically active, doing cross-training, yoga, and maintaining a vigorous lifestyle without symptoms." R at 297-98. He found her to have a mild pectus excavatum and a mid-systolic click that moved to S1 with standing and then to S2 and a physiologically split S2. R at 297-98. Dr. Wallis prescribed Plaintiff with 25 mg of Atenolol. R at 298. On January 22, 1997, a Doppler was performed, which revealed trivial tricuspid regurgitation and no evidence of a mitral valve prolapse. R at 483-84. Dr. Wallis further reported that Plaintiff indicated no congestive symptoms, including no shortness of breath. R at 297-8. Plaintiff disclosed the palpitation-related visits to Dr. Wallis on February 6, 1997, and stated that she continued to suffer stress because of the declining health of her parents. R at 296. Dr. Fisher's notes from May 13, 1997 further indicate that Dr. Wallis was weaning Plaintiff from the Atenolol, due to the medication's toxicities. R at 294.

11

On August 12, 1997, Dr. Fischer noted that Plaintiff was exercising daily and doing well. R at 289. On October 2, 1997, she was treated for the abnormal growth of her left big toe nail. R at 285-88. Dr. Wallis continued Plaintiff's prescription for Atenolol on December 12, 1997. R at 476.

Through December, 1997 and January, 1998, Plaintiff suffered bouts of sinusitis, with nasal congestion, headaches and cervical lymphadenopathy. R at 282. By March of 1998, her condition was "much improved." R at 280-83. On April 14, 1998, Plaintiff complained of some intermittent dizziness, nasal congestion, aurophonia, and tinnitus; this was found to be the result of resolved chronic sinusitis. R at 277-78. In May and August, 1998, Plaintiff was again treated for sinusitis as well as a crush injury to her finger. R. at 269-76, 398-400. The Plaintiff's finger splint was changed in September, and she continued to be treated for her recurrent sinusitis. R at 261-68. On November 24, 1998, Plaintiff underwent an endoscopy of her nasal cavities, which did not indicate any recurrence of lymphoma; she also indicated that her sinus infection had been resolved. R at 258-59.

On February 16, 1999, Plaintiff noted that she was feeling well and even "contemplating some projects at work in the summer." R at 255-7. Plaintiff reported neck and right knee pain on March 23, 1999, and on April 9, 1999, she was admitted to

12

Loyola Hospital for a Maquet procedure. R at 246-53. She began physical therapy on May 4, 1999, and was noted to have experienced night sweats following surgery. R at 242-45. An aortic scan on June 10, 1999 revealed no change in Plaintiff's condition, and, apart from her knee surgery, the Plaintiff was said to be "doing well." R at 241. Exam notes indicate that Plaintiff's knee healed well between June and August, 1999. R at 414-15. On September 7, 1999, Plaintiff reported fatigue, lower back pain, and an episode of nausea and vomiting; she also experienced an allergic reaction to the antibiotic she was taking for a dental infection. R at 238-40. Plaintiff further reported groin pain on December 21, 1999, although that dissipated as a result of the antibiotics she was taking. R at 233.

On March 21, 2000, Plaintiff alerted doctors of small nodes in her neck that had resolved themselves. R at 231-32. She then complained further that she was having a lot of stress due to deaths in her family. R at 228-29. But by January 23, 2001, Plaintiff's lymphoma was still in complete remission, and she "showed no evidence of disease recurrence." R at 220. Plaintiff remained free of cancer on July 17, 2001, but she continued to have sinoventriculary tachcycardia ("SVT"), requiring further consultation with a cardiologist. R at 216-17. Records also indicate that she was continuing to have palpitations on July 31, 2001. R at 489. Another Doppler report on September 26, 2001,

reconfirmed the presence of trivial tricuspid regurgitation. R
at 495. On January 15, 2002, Plaintiff showed signs of a
possible progression of her lymphoma. R at 214-15. However, a
report on the Plaintiff issued July 16, 2002 indicated "no
obvious evidence of disease recurrence." R at 210. On October
15, 2002, Plaintiff complained of pains in her jaw and left arm
and an irregular heartbeat, the degree of which was mitigated by
her ingestion of Aspirin. R at 208. A stress test conducted
November 11, 2002, showed that Plaintiff was negative for
ischemia. R at 482. In June 2003, Plaintiff, although she felt
"quite well" and had "good energy," was found to have small,
enlarged lymph nodes, although a biopsy was not recommended at
that time. R at 452-53.

On May 27, 2005, a state medical consultant, Richard
Bilinsky, completed a Physical Residual Functional Capacity
("RFC") Assessment, and determined that there was insufficient
evidence to support a finding that Plaintiff could establish
disability from this condition prior to December, 1996. R at
420-27. These findings were affirmed on August 16, 2005. R at
428-29. Dr. Bilinsky concluded that, based upon the evidence in
the Record, Plaintiff suffered from no exertional, postural,
manipulative, visual, communicative, or environmental limitations
whatsoever. R at 421-24.

On August 23, 2005, Plaintiff exhibited multiple enlarged periaortic lymph nodes on a CT scan; they seemed, however, to be stabilizing and diminishing. R. at 454-55. Plaintiff then complained of facial pain and headaches, and she underwent a sinus CT that showed mucosal thickening, turbinate edema, deviation of the nasal septum, and hypoplastic frontal sinuses. R. at 432. Plaintiff visited Dr. Gregory S. Bussell, an ear, nose, throat, head, and neck surgeon on December 9, 2005, and he found her neck to be swollen on the right side, firm and sensitive to the touch. R. at 433-34. Dr. Bussell scheduled Plaintiff for fine needle aspiration to determine whether the swelling could represent recurrence of her lymphoma. *Id.* Plaintiff underwent this procedure on December 16, 2005, and the specimens revealed that her lymphoma was recurring. R. at 435-43. Plaintiff then began a course of high dose chemotherapy with autologous stem cell transplant and carboplatin, etoposide, ifosfamide and mesna injections. R at 458-74.

## The ALJ's Decision

The ALJ denied Plaintiff benefits on January 24, 2007. R. at 14. In making this decision, he applied the familiar five-step evaluation required for these claims by 20 C.F.R. § 404.1520. R. at 17-19. At the fifth step of the evaluation, the ALJ determined that Plaintiff was not disabled under the Social Security Act, because she retained the RFC to perform sedentary

15

work at the date she was last insured (December 31, 1996). R. at
20. In so finding, the ALJ stated that, at that date, Plaintiff
would have been capable of lifting ten pounds occasionally and
lesser amounts frequently, and that she would have been capable
of standing and/or walking for a period of two hours within a
typical eight-hour working day. R. at 20. The ALJ did recognize
that the symptoms of which Plaintiff complained could reasonably
have resulted from her medically determinable impairments. R. at
20. However, in support of his findings, he also noted that
Plaintiff's statements regarding the recurrence, intensity, and
effects of these symptoms were not entirely credible. R. at 20.
He noted the multiple occasions on which Plaintiff reported
feeling well and staying active prior to the date on which she
was last insured. R. at 20-22.

## STANDARD OF REVIEW

A district court reviewing an ALJ's decision must affirm if
the decision is supported by substantial evidence and is free
from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290
F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more
than a mere scintilla"; rather, it is "such relevant evidence as
a reasonable mind might accept as adequate to support a
conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).
In reviewing an ALJ's decision for substantial evidence, the
Court may not "displace the ALJ's judgment by reconsidering facts

16

or evidence or making credibility determinations." *Skinner v.*
*Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Jens v.*
*Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). Where conflicting
evidence allows reasonable minds to differ, the responsibility
for determining whether a claimant is disabled falls upon the
Commissioner, not the courts. *Herr v. Sullivan*, 912 F.2d 178,
181 (7th Cir. 1990).

An ALJ must articulate his analysis by building an accurate
and logical bridge from the evidence to his conclusions, so that
the Court may afford the claimant meaningful review of the SSA's
ultimate findings. *Steele*, 290 F.3d at 941. It is not enough
that the record contains evidence to support the ALJ's decision;
if the ALJ does not rationally articulate the grounds for that
decision, or if the decision is not sufficiently articulated, so
as to prevent meaningful review, the Court must remand. *Id.*

### SOCIAL SECURITY REGULATIONS

An individual claiming a need for DBI or SSI must prove that
he or she has a disability under the terms of the SSA. In
determining whether an individual is eligible for benefits, the
social security regulations require a sequential five step
analysis. First, the ALJ must determine if the claimant is
currently employed; second, a determination must be made as to
whether the claimant has a severe impairment; third, the ALJ must
determine if the impairment meets or equals one of the

17

impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; fourth, the ALJ must determine the claimant's RFC, and must evaluate whether the claimant can perform his or her past relevant work; and fifth, the ALJ must decide whether the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). At steps one through four, the claimant bears the burden of proof; at step five, the burden shifts to the Commissioner. *Id.*

## DISCUSSION

### I. **The ALJ's RFC Determination Is Not Supported By Substantial Evidence.**

In his decision, the ALJ concluded that Plaintiff had "the RFC to perform sedentary work; i.e. lifting 10 pounds occasionally and less amounts frequently, and standing and/or walking for no more than two hours in an eight hour day." R at 20. Plaintiff argues that the ALJ failed to build a logical and accurate bridge between the record evidence and his RFC. Specifically, the Plaintiff argues that the ALJ failed to indicate what evidence he relied upon in fashioning the RFC, and instead impermissibly played doctor by creating an RFC with no basis in the medical evidence.

A review of the record bears out Plaintiff's position. In this case, the only evidence concerning the Plaintiff's RFC as of December 31, 1996, consists of the report prepared by state

18

medical consultant Richard Bilinsky on May 27, 2005, and the testimony of Plaintiff and her husband. In his report, Dr. Bilinsky concluded that Plaintiff suffered from no exertional, postural, manipulative, visual, communicative, or environmental limitations whatsoever. R. 420-27. Conversely, Plaintiff and her husband testified that her knee pain prevented her from walking or even sitting for long periods, and that her recurring lymphoma and the resulting treatments weakened her generally and rendered her unable to work[2]. The ALJ expressly found Plaintiff's testimony concerning the extent of her limitations to be incredible, and he also implicitly rejected the absence of any limitations, as found by Dr. Bilinsky, by finding Plaintiff limited to sedentary work.

Instead, the ALJ "constructed a 'middle ground' and came up with [his] own *physical* RFC assessment. In fact [he] made specific lift, carry, push and or pull findings consistent with the" sedentary work requirements. *Bailey v. Barnhart,* 473 F. Supp. 2d 822, 838-39. (N.D. Ill. 2006). Interestingly, in rejecting the only medical RFC analysis in the record, the ALJ actually came down in favor of Plaintiff, by finding Plaintiff to be more restricted than Dr. Bilinsky opined. But in doing so, he made no citation whatsoever to any evidence in the Record, and

---

[2] Notably, even the testimony of Plaintiff and her husband support the notion that Plaintiff's condition became more debilitating long after her date last insured.

19

the Court is unable to discern where he found medical evidence to support this finding. Instead, it appears that the ALJ simply "split the baby," so to speak, between Dr. Bilinsky's assessment and Plaintiff's claims. "The ALJ simply cannot do this. Having rejected the available medical record upon which to base an RFC assessment, the ALJ was then required to call a medical advisor and/or obtain clarification of the record to flesh out what [he] needed to support [his] decision." *Id.* at 839.

Defendant makes much of the fact that the ALJ was not required to call an ME[3]. HALLEX 1-2 5-32. While the ALJ retains the discretion to call a medical advisor, 20 C.F.R. 404.1527(f)(2)(iii), he is not free to proceed upon a "hunch" in cultivating the claimant's RFC. *Wilder v. Chater,* 64 F.3d 355, 358 (7th Cir. 1995). Even when in doing so, the ALJ errs in a claimant's favor. To be sure, there is a dearth of medical evidence in the Record suggesting that Plaintiff was as limited as or more limited than the ALJ found prior to her date last insured. But, because the ALJ erred and played doctor, instead of relying upon or further developing the evidence in the Record, his decision cannot be found to have been supported by substantial evidence and must be remanded.

---

[3] The Court agrees that SSR 83-20 did not compel the ALJ to call a Medical Advisor in this case, because the ALJ never found that Plaintiff was disabled. *Scheck,* 357 F.3d at 701. Plaintiff's factual assertions to the contrary are erroneous and the cases she cites in support of this argument are inapposite.

## II. The ALJ's Credibility Determination was Appropriate

Next, Plaintiff argues that the ALJ violated SSR 96-7p and
20 C.F.R. 404.1529, by making a credibility determination that
was vague and unsupported. The Court disagrees. First, an ALJ's
credibility determination will not be overturned unless patently
wrong. *Zurawski v. Halter,* 245 F.3d 881, 887 (7ᵗʰ Cir. 2001).
In evaluating a claimant's testimony concerning her limitations,
the regulations require the ALJ to: 1) consider whether an
underlying medical impairment can be shown that could reasonably
be expected to produce the individual's symptoms; and 2) evaluate
the limiting effects of the individual's symptoms to determine
the extent to which they limit the individual's ability to
perform basic work activities. 20 C.F.R. § 404.1528(a).

In issuing his decision, the ALJ concluded that "claimant's
medically determinable impairments could reasonably be expected
to produce the alleged symptoms, but the claimant's statements
concerning the intensity, persistence and limiting effects of
those symptoms are not entirely credible." R at 20. The ALJ then
noted Plaintiff's extensive activities of daily living- such as
shopping, doing yoga, cross-training, taking trips,- as well as
doctors' notations reflecting her "vigorous" lifestyle.

Plaintiff is dissatisfied, noting first that the ALJ does
not expressly state that this was why he discounted Plaintiff's
credibility. The Court isn't persuaded; a common sensical

21

reading of the ALJ's opinion indicates that his credibility determination was clearly based upon Plaintiff's multiple reports to her doctors of feeling well and staying active, despite her treatments.

Next, Plaintiff argues that the Seventh Circuit takes a dim view of ALJs who equate a claimant's ability to undertake everyday tasks with the ability to perform in the workplace, citing *Zurawski,* 245 F.3d at 887, and *Carradine v. Barnhart,* 360 F.3d 751, 753 (7th Cir. 2006) among other cases. These cases are readily distinguishable. In contrast to Plaintiff's yoga, cross training, and traveling, the Seventh Circuit noted that the *Zurawski* claimant's daily activities were fairly limited (washing dishes, preparing his children for school, doing laundry) and not inconsistent with his claims of disabling pain. 245 F.3d at 887-88. And the *Carradine* court took the ALJ to task for deeming a witness incredible, where the witness's perception of her pain was influenced by a psychiatric disorder, noting that "[i]f pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits." 360 F.3d at 754.

A portion of the *Carradine* decision is, however, relevant to the Court's discussion, wherein the Seventh Circuit cautioned against confusing a claimant's ability to sporadically undertake certain tasks or exercises- particularly when done for therapeutic reasons- with the ability to hold a job. 360 F.3d at

755-56. In this case, however, the Record evidence contradicts Plaintiff's testimony that she only exercised for therapeutic purposes and only sporadically. To the contrary, she reported to Dr. Fisher as late as January of 1997 that she was "physically active, doing cross-training, yoga and maintaining a vigorous lifestyle without symptoms." R at 478. The nonexertional symptoms of which she complained began in approximately December of 1996- around the time of her date last insured. Id.

The Court concludes that the ALJ fairly navigated the fine line between improperly discounting a witness' complaints of pain due to her ability to undertake limited or sporadic activities, and properly finding that the witness' complaints of disabling pain and fatigue are belied by objective, contemporaneous statements in the Record.

## III.   Use of the Grids is Permissible, Unless the ALJ finds Non-Exertional Limitations

Finally, Plaintiff argues that the ALJ inappropriately relied upon the Medical-Vocational Guidelines (the "Grids") at Step Five. Plaintiff essentially concedes that, if the ALJ's RFC and credibility determinations were supported by substantial evidence, then reliance upon the Grids would have been acceptable.   However, if, upon remand, the ALJ determines that the Plaintiff suffered from additional, non-exertional limitations, then the ALJ should not rely upon the Grids at Step

23

Five of his analysis. *Pugh v. Bowen,* 870 F.2d 1271, 1277 n. 6
(7th Cir. 1989) (ruling that "[u]se of the grid is not
appropriate where a claimant's non-exertional impairments
preclude the claimant from performing the full range of work in
any given exertional level.") In such a circumstance, the ALJ
should instead call upon a VE to assess whether the Plaintiff's
non-exertional limitations would substantially erode the category
of otherwise appropriate jobs. 20 C.F.R. § 404.1566(e).

## CONCLUSION

This case illustrates the difficulties confronting ALJ's
when attempting to adjudicate cases in which claimants file
claims many years after the time during which they claim
disability. In this case, Plaintiff- who may or may not be
disabled now- claims that she was disabled nine years prior to
the filing of her claim and more than ten years prior to her
appearance before the ALJ. With medical records that do little
to shed light on her functional capacity during the relevant time
period, and only the testimony of Plaintiff and her husband in
this regard, the ALJ had to make a decision, after carefully and
painstakingly considering the evidence. He could have adopted
the conclusion of Dr. Bilinsky and found that the medical
evidence did not show that Plaintiff had any limitations that
would have affected her ability to work on or prior to December
31, 1996, or he could have, after crediting the testimony of the

24

witnesses, disagreed with that opinion and found that she could not have held down a job during that time. Either conclusion would arguably have been supported by substantial evidence. The ALJ erred, however, when he rejected Dr. Bilinsky's RFC analysis and, apparently giving Plaintiff the benefit of the doubt, found that she could only do sedentary work during the relevant time period, without an adequate explanation of his decision to do so.

It is clear to the Court that the ALJ thoroughly, thoughtfully, and compassionately reviewed the evidence and Plaintiff's claims in this case. Nevertheless, he exceeded his authority by constructing for Plaintiff an RFC that had no basis in the Record evidence, even though the error was in her favor. The Court emphasizes that, other than this error, it can find no fault with the ALJs' analysis of this very difficult case. However, for this reason alone, the Court GRANTS Plaintiff's Motion for Summary Judgment, in part, remanding the matter to the Commissioner for further action consistent with this Opinion.

Dated: February 12, 2009     E N T E R:

Arlander Keys

ARLANDER KEYS
United States Magistrate Judge

25